T.C. Memo. 2004-279

UNITED STATES TAX COURT

GLENN A. MORTENSEN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25991-96.          Filed December 15, 2004.

<u>Wendy S. Pearson</u>, <u>Terri A. Merriam</u>, and <u>Jennifer A. Gellner</u>,
for petitioner.

<u>Nhi T. Luu-Sanders</u> and <u>Catherine Caballero</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GOLDBERG, <u>Special Trial Judge</u>:  Respondent determined that
petitioner is liable for a section 6662(a) accuracy-related
penalty of $784 for the taxable year 1991.  Unless otherwise
indicated, section references are to the Internal Revenue Code in

effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The sole issue before this Court is whether petitioner is liable for the section 6662(a) accuracy-related penalty for negligence or disregard of rules or regulations in the year in issue.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The first, second, third, and fourth stipulations of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in Hixson, Tennessee, on the date the petition was filed in this case.

## I. Walter J. Hoyt III and the Hoyt Partnerships

The accuracy-related penalty at issue in this case arises from an adjustment of a partnership item on petitioner's 1991 Federal income tax return. This adjustment is the result of petitioner's involvement in certain partnerships organized and promoted by Walter J. Hoyt III (Mr. Hoyt).

Mr. Hoyt's father was a prominent breeder of Shorthorn cattle, one of the three major breeds of cattle in the United States. In order to expand his business and attract investors, Mr. Hoyt's father had started organizing and promoting cattle breeding partnerships by the late 1960s. Before and after his father's death in early 1972, Mr. Hoyt and other members of the

Hoyt family were extensively involved in organizing and operating numerous cattle breeding partnerships. From about 1971 through 1998, Mr. Hoyt organized, promoted to thousands of investors, and operated as a general partner more than 100 cattle breeding partnerships. Mr. Hoyt also organized and operated sheep breeding partnerships in essentially the same fashion as the cattle breeding partnerships (collectively the "investor partnerships" or "Hoyt partnerships"). Each of the investor partnerships was marketed and promoted in the same manner.

Beginning in 1983, and until removed by this Court due to a criminal conviction, Mr. Hoyt was the tax matters partner of each of the investor partnerships that are subject to the provisions of the Tax Equity & Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324. As the general partner managing each partnership, Mr. Hoyt was responsible for and directed the preparation of the tax returns of each partnership, and he typically signed and filed each return. Mr. Hoyt also operated tax return preparation companies, variously called "Tax Office of W.J. Hoyt Sons", "Agri-Tax", and "Laguna Tax Service", that prepared most of the investors' individual tax returns during the years of their investments. Petitioner's 1991 return was prepared in this manner and was signed by Mr. Hoyt. From approximately 1980 through 1997, Mr. Hoyt was a licensed enrolled agent, and as such he represented many of the investor-partners

before the Internal Revenue Service (IRS) until he was disenrolled as enrolled agent in 1998.

Beginning in February 1993, respondent generally froze and stopped issuing income tax refunds to partners in the investor partnerships. The IRS issued prefiling notices to the investor-partners advising them that, starting with the 1992 taxable year, the IRS would disallow the tax benefits that the partners claimed on their individual returns from the investor partnerships, and the IRS would not issue any tax refunds these partners might claim attributable to such partnership tax benefits.

Also beginning in 1993, an increasing number of investor-partners were becoming disgruntled with Mr. Hoyt and the Hoyt organization. Many partners stopped making their partnership payments and withdrew from their partnerships, due in part to respondent's tax enforcement. Mr. Hoyt urged the partners to support and remain loyal to the organization in challenging the IRS's actions. The Hoyt organization warned that partners who stopped making their partnership payments and withdrew from their partnerships would be reported to the IRS as having substantial debt relief income, and that they would have to deal with the IRS on their own.

On June 5, 1997, a bankruptcy court entered an order for relief, in effect finding that W.J. Hoyt Sons Management Company and W.J. Hoyt Sons MLP were both bankrupt. In these bankruptcy

cases, the U.S. trustee moved in 1997 to have the bankruptcy court substantively consolidate all assets and liabilities of almost all Hoyt organization entities and all of the investor partnerships. On November 13, 1998, the bankruptcy court entered its Judgment for Substantive Consolidation, consolidating all the above-mentioned entities for bankruptcy purposes. The trustee then sold off what livestock the Hoyt organization owned or managed on behalf of the investor partnerships.

Mr. Hoyt and others were indicted for certain Federal crimes, and a trial was conducted in the U.S. District Court for the District of Oregon. The District Court described Mr. Hoyt's actions as "the most egregious white collar crime committed in the history of the State of Oregon." Mr. Hoyt was found guilty on all counts, and as part of his sentence in the criminal case he was required to pay restitution in the amount of $102 million. This amount represented the total amount that the United States determined, using Hoyt organization records, was paid to the Hoyt organization from 1982 through 1998 by investor-partners in various investor partnerships.

II. Petitioner and His Investment

Petitioner has a college education with a bachelor of science degree in engineering. During the year in issue, petitioner was employed as a field engineer. At the time that he invested in the Hoyt partnerships, petitioner did not have any

significant investment experience, and he did not have any experience with farming or cattle.

Petitioner first learned about the Hoyt partnerships from a coworker in late 1985 or early 1986. At the suggestion of this coworker, who was already an investor in a Hoyt partnership, petitioner decided to look into making an investment. Petitioner, along with a group of four or five other coworkers, acquired an informational packet from the Hoyt organization.

Petitioner first invested in the Hoyt partnerships in 1986. Prior to investing, petitioner received promotional materials prepared by the Hoyt organization, some of which he had acquired in his initial request for information. Petitioner relied on these promotional materials which, in general, provided rationales for why the partnerships were good investments and why the purported tax savings were legitimate. One document on which petitioner relied, entitled "Hoyt and Sons -- The 1,000 lb. Tax Shelter", provided information concerning the Hoyt investment partnerships and how they purportedly would provide profits to investors over time. The document emphasized that the primary return on an investment in a Hoyt partnership would be from tax savings, but that the U.S. Congress had enacted the tax laws to encourage investment in partnerships such as those promoted by Mr. Hoyt. The document stated that an "investment in cattle [is arranged] so the cash required to keep it going is only about

seventy five percent" of an investor's tax savings, while the other twenty-five percent of the tax savings is "a thirty percent return on investment."  This arrangement purportedly provided protection to investors:  "If the cows do die and the sky falls in, you have still made a return on the investment, and no matter what happens you are always better off than if you paid taxes."  After an explanation of the tax benefits, the document asked: "Now, can you feel good about not paying taxes, and feeling like you were not, somehow, abusing the system, or doing something illegal?"

A section of the "1,000 lb. Tax Shelter" document that was devoted to a discussion of audits by the IRS, stated that the partnerships would be "branded an 'abuse' by the Internal Revenue Service and will be subject to automatic" and "constant audit".  Statements in the document compared the IRS to children, stating that IRS employees did not have the "proper experience and training" and "working knowledge of concepts required by the Internal Revenue Code" to evaluate the partnerships.  In a section of the document titled "Tax Aspects", the following "warning" was given:

> Out here, tax accountants don't read brands, and our cowboys don't read tax law.  If you don't have a tax man who knows you well enough to give you specific personal advice as to whether or not you belong in the cattle business, stay out. The cattle business today cannot be separated from tax law any more than cattle can be separated from grass and water. Don't have anything to do with any aspect of the cattle

business without thorough tax advice, <u>and don't waste much time trying to learn tax law from an Offering Circular</u>.

Despite this warning, the document spent numerous pages explaining the tax benefits of investing in a Hoyt partnership, and explaining why investors should trust only Mr. Hoyt's organization to prepare their individual tax returns:

> It is the recommendation of the General Partner, as outlined in the private placement offering circular, that a prospective Partner seek independent advice and counsel concerning this investment. * * * The Limited Partners should then authorize the Tax Office of W.J. Hoyt Sons to prepare their personal returns. * * * Then you have an affiliate of the Partnership preparing all personal and Partnership returns and controlling all audit activity with the Internal Revenue Service. * * * Then, all Partners are able to benefit from the concept of "Circle the Wagons," and no individual Partner can be isolated and have his tax losses disallowed because of the incompetence or lack of knowledge of a tax preparer who is not familiar with the law, regulations, format, procedures, and operations concerning the Partnership that are required to protect the Limited Partners from Internal Revenue audits. * * * If a Partner needs more or less Partnership loss any year, it is arranged quickly within the office, without the Partner having to pay a higher fee while an outside preparer spends more time to make the arrangements.

Finally, the document warned that there remained a chance that "A change in tax law or an audit and disallowance by the IRS could take away all or part of the tax benefits, plus the possibility of having to pay back the tax savings, with penalties and interest."

At the time that he initially made the investment in 1986, petitioner believed that the investment would produce a profit and provide retirement income.

In July 1986, petitioner invested in a Hoyt partnership known as Durham Genetic Engineering 1986-1 (DGE 86-1). However, this partnership was "rescinded" later that year, forcing petitioner to invest in another partnership known as Shorthorn Genetic Engineering 1986 Ltd. (SGE 86). On December 22, 1986, petitioner signed a series of four documents relating to his investment in SGE 86. The first document was titled "1986 Acknowledgement". This document provided: "This is to acknowledge I became a Partner in DGE 1986-1 on/or about July 22, 1986, and that I owned an undivided 1/30th interest in the partnership on that date through a binding oral and/or written agreement * * * . I agree to adopt and to be bound by all the terms of the Partnership Agreement." The second document, titled "Instructions to the Managing General Partner and and [sic] Acknowledgement of Certain Agreements", provided in relevant part:

> (1) I [petitioner] hereby give you [Mr. Hoyt] the irrevocable authority to sign my name to a Certificate of Assumption of Primary Liability Form on a full recourse Promissory Note in the amount of $75,000.00 that will become part of a transfer of debt agreement between me, the Partnership and HOYT & SONS RANCHES, said note having been delivered to pay for breeding cattle purchased from HOYT & SONS RANCHES, an Oregon Partnership, in Burns, Oregon, which are to be held as breeding cattle by the above named Partnership. This authorizes you to sign my name on notes that were made for the purchase of Registered Shorthorn Breeding cattle from HOYT & SONS RANCHES, and no other purpose. I understand I will owe this amount directly to HOYT & SONS RANCHES and not to my Partnership. I understand I must pay this debt myself. It is my goal to pay it out of my share of the Partnership profits.

The third document, titled "Instructions to Hoyt and Sons Ranches -- Acknowledgement of Appointment of Power of Attorney", provided:

> (1)  I have given Walter J. Hoyt III the irrevocable authority to sign my name to a Certificate of Assumption of Primary Liability Form as part of a transfer on a full recourse Promissory Note in the amount of $75,000.00, that will become part of a transfer of debt agreement between me, the Partnership known as Shorthorn Genetic Engineering 1986 Ltd., and HOYT & SONS RANCHES, said note having been delivered to HOYT & SONS RANCHES to pay for breeding cattle purchased from HOYT & SONS RANCHES, an Oregon Partnership, in Burns, Oregon, which are to be held as breeding cattle by the above named Partnership.  This authorizes Mr. Hoyt to sign my name on the notes that were made for the purchase of Registered Durham Breeding cattle from HOYT & SONS RANCHES, and no other purpose.  I understand I will owe this amount directly to HOYT & SONS RANCHES, and not to my partnership.

> *  *  *  *  *  *  *

> (4)  My goal is that the value of my share of the cattle owned by the Partnership, in which you have a secured party interest, must never fall below the amount for which I am personally liable.  If the value of my cattle does fall below the amount of my loan, and you become aware of that, you must so notify me within thirty days in order that I may make a damage claim to W.J. Hoyt Sons Management Company for possible default on the Share-Crop Operating Agreement, and/or the cattle fertility warranties.

The final document was titled "Subscription Agreement -- Shorthorn Genetic Engineering 1986 Ltd. -- Series 'C' Units". This document expressed petitioner's intent to make a capital contribution to and become a limited partner of SGE 86 by purchasing units valued at $75,000.  Included with this document was a "Power of Attorney" form, which provided in relevant part:

> The UNDERSIGNED hereby constitutes and appoints Walter J. Hoyt III his/her true and lawful attorney with power and

authority to act in the UNDERSIGNEDS' behalf in the
execution, acknowledging, and filing of the documents as
follows:

1. The Partnership agreements for filing, and

2. Any documents which may be required to effect the
restructuring, amending, or continuation of the Partnership,
the admission of any substituted or added Partner, or the
dissolution and termination of the Partnership, provided
such restructuring, continuation, admission or dissolution
and termination are in accordance with the terms of the
Partnership Agreement, and

3. Any and all documents required to be executed by a
substituted, substituting or added Partner, to effectuate
the transfer of a Partner's interest in the Partnership, and

4. Any other instrument, application, certificate, or
affidavit which may be required to be filed by the
Partnership under the laws of any State or any Federal or
local agency or authority, and

5. Any promissory notes, bills-of-sale or other
instruments required for the conduct of the Partnership
business, including a certificate of assumption of primary
liability form attached to promissory notes and held by the
lender for which the UNDERSIGNED becomes personally liable
directly to the lender for recourse debt of the Partnership
in order to pay his initial capital contribution to the
partnership.

When petitioner entered into the investment, he believed that he
would be liable for the promissory notes, but he also believed
that cattle existed that could be sold to cover the debt.

On December 31, 1986, Mr. Hoyt signed a "Certificate of
Assumption of Primary Liability" on petitioner's behalf.  This
document provided that petitioner "personally assumes primary
liability for the prompt payment when due of any and all
liability or indebtedness of the Partnership" in the amount of

$122,000.  While the documents signed by petitioner described above pertain to SGE 86, this document signed by Mr. Hoyt referred to the partnership known as Shorthorn Genetic Engineering 1984-2 (SGE 84-2).

In 1989, petitioner received from the Hoyt organization a copy of this Court's opinion in Bales v. Commissioner, T.C. Memo. 1989-568.  Mr. Hoyt touted the Bales opinion as proof that the Hoyt partnerships were legal, and that the IRS was incorrect in challenging their tax claims.  Petitioner did not read the entire opinion, instead relying on information from the Hoyt organization interpreting the opinion.

Beginning sometime in the early 1990s, petitioner started attending a number of monthly meetings of Hoyt partners that were held near petitioner's home.  At these meetings, petitioner would discuss various issues pertaining to the partnerships with the other partners, including a number of partners who had visited the Hoyt ranches.  Petitioner considered attendance at these meetings, as well as any time that he was "actively aware of the proceedings of the business", to be material participation with respect to his investment.

Throughout the years of his involvement with the Hoyt organization, petitioner's investment was transferred between partnerships without any action being taken by petitioner. Petitioner believed that Mr. Hoyt was using his power of attorney

to do the necessary paperwork, and, if asked, petitioner would accept any suggestions made by the Hoyt organization for changes to his investment. Petitioner believed that at least one reason for the changes was to maximize tax savings available to him. Petitioner typically did not receive any type of verification that his partnership interest had been successfully transferred, or that his name had been taken off any promissory notes that had been signed on his behalf.

The underlying partnership adjustment in this case was made with respect to a partnership known as Durham Shorthorn Breeding Syndicate 1987-C (DSBS 87-C). There are no documents in the record pertaining to any investment by petitioner in DSBS 87-C.

Petitioner made substantial cash payments to the Hoyt organization during the years 1986 through 1997; petitioner estimates that the total amount of these payments was approximately $93,000. These payments included the remittance of his tax refunds, the payment of quarterly and monthly installments on his promissory notes, special "assessments" imposed by the partnerships, and contributions to purported individual retirement account plans maintained by the Hoyt organization. Petitioner has received only nominal amounts of his contributions back from the Hoyt organization. Before and after the year in issue, petitioner received numerous documents purporting to show both the legitimacy of the Hoyt partnerships

and the legality of the tax claims being made by the Hoyt organization. The Hoyt organization also portrayed employees of the IRS as incompetent and claimed that they were engaging in unjust harassment of Hoyt investors. Petitioner trusted these documents and believed and relied upon what the Hoyt organization told him.

III. Petitioner's Federal Tax Claims

Petitioner reported the following on his Federal income tax returns in each of the respective years:

|  | 1986 | 1987 | 1988 | 1989 | 1990 |
|---|---|---|---|---|---|
| Wage income | $43,112 | $40,033 | $46,858 | $44,813 | $45,734 |
| Interest income | 3,126 | 2,010 | 1,974 | 2,633 | 3,577 |
| Other income[1] | -0- | 1,754 | -0- | 1,608 | -0- |
| Partnership losses | 141,260 | 24,931 | 33,712 | 23,741 | 20,180 |
| Tax liability | -0- | 464 | 1,054 | 926 | 1,181 |

[1]The other income was derived from capital gain from the sale of a residence in 1987, and income from pensions and annuities in 1989.

The amounts listed above for 1986 are those amounts that appear on the amended return filed by petitioner for that year. On the original return, petitioner had reported a partnership loss of $27,170 and an investment tax credit of $17,412, both derived from the "rescinded" partnership DGE 86-1. The original return also reflected zero tax liability. The amended return, reflecting a $141,260 loss from SGE 84-2, explained the reason for the amended return as follows:

> During 1986, the Taxpayers [sic] became a General Partner in the Partnership known as Durham Genetic Engineering 1986-1. Taxpayers' partnership purchased a group of registered cattle during 1986. After the Partnership began business, the Taxpayers elected to accept rescission of their

partnership interest offered by the Managing General Partner on behalf of the Partnership, and no longer claim any loss or Investment Tax Credit allocated to them by that Partnership.

As a former General Partner, the Taxpayers now adopt the position they became a co-owner/joint tenant in the herd of cattle that was purchased in the name of the partnership on the date of purchase, which they paid for by signing a full recourse promissory note on Dec. 28, 1986. The Taxpayers have now elected to combine their cattle with another Partnership known as [SGE 84-2]. Accordingly, the Taxpayers are now reporting the 1986 expenses from the cattle owned by them on Schedule E, and the depreciation on Schedule F.

Taxpayers now claim, or will claim in 1987, the Investment Tax Credit on their cattle as a transferee of used transition property that was placed in service by the transferor prior to the transfer. The Taxpayers have obtained certain rights in a binding purchase agreement signed by the transferor prior to December 31, 1985, for the purchase of the cattle.

After filing the 1986 return, petitioner also filed a Form 1045, Application for Tentative Refund, based on a carryback of a claimed net operating loss (NOL) of $98,148 from 1986. This form reflected the following:

|  | 1983 | 1984 | 1985 |
|---|---|---|---|
| Adjusted gross income | $34,618 | $43,487 | $38,065 |
| Tax liability on original return | 4,821 | 7,517 | 6,210 |
| Tax liability after NOL carryback | -0- | -0- | -0- |

In addition to this Form 1045, there is in the record a copy of another Form 1045 that reflects a credit carryback rather than an NOL carryback. It is unclear whether this form was submitted to respondent; regardless, it is clear that the Form 1045 reflecting the NOL carryback was meant to supersede the other form. The superseded Form 1045 reflected a carryback of a $16,868 general

business credit from petitioner's taxable year 1986. While application of the credit purportedly would have resulted in the elimination of petitioner's regular tax liability in 1983, 1984, and 1985, petitioner would have reported liability for alternative minimum tax of $855 in 1984 and $992 in 1985.

By letter dated May 23, 1988, respondent notified petitioner that SGE 84-2's taxable year 1987 was under review. This letter stated in relevant part:

> Our information indicates that you were a partner in the above partnership during the above tax year. Based upon our review of the partnership's tax shelter activities, we have apprised the Tax Matters Partner that we believe the purported tax shelter deductions and/or credits are not allowable and, if claimed, we plan to examine the return and disallow the deductions and/or credits. The Internal Revenue Code provides, in appropriate cases, for the application [of various penalties].

By similar letter dated May 9, 1989, respondent notified petitioner that another of his Hoyt partnerships, Timeshare Breeding Service (TBS), was under review with respect to its taxable year 1988.

In January 1992, respondent mailed Hoyt investors, including petitioner, a letter regarding the application of section 469 (relating to passive activity loss limitations). That same month, Mr. Hoyt mailed a letter to investors, including petitioner, setting forth arguments that Hoyt investors materially participated in their investments within the meaning of section 469. In this letter, Mr. Hoyt stated that

respondent's assertions in the preceding letter were incorrect, and that the investors should do what was necessary to participate in their investment at least 100 or 500 hours per year, depending upon the circumstances, in order to meet the section 469 requirements.  Mr. Hoyt stated that the time investors spent in recruiting new investors, as well as "reading and thinking about these letters", would count toward the material participation hourly requirements.  Finally, in this letter Mr. Hoyt emphasized that "The position of your partnership is that it is not a tax shelter", because tax shelters "are never recognized for Federal income tax purposes."  By letter dated February 11, 1992, respondent mailed petitioner a notice stating:

> In Mr. Hoyt's letter misleading and/or inaccurate premises were made which may directly affect you and your decision-making process in filing your 1991 individual tax return.
> First, a "tax shelter" is not necessarily synonymous with a "sham" investment.  Low income housing credits, your personal residence, and real estate rentals are examples of tax shelters.  It is an oversimplification to state tax shelters are never recognized for Federal income tax purposes.
> The letter stated that I failed to include number seven of the regulations which addresses the facts and circumstances test.  Enclosed is the exact wording of this test, Regulation 1.469-5T(a)(7), and example #8 which refers to this regulation.  Also enclosed is paragraph (b) that is referred to in paragraph (a)(7).  Section 1402 noted in paragraph (b) defines income subject to self-employment tax.  In the past, and currently, Mr. Hoyt has used Revenue Rulings 56-496, 57-58, and 64-32 as authorities for investors having met the material participation requirement.  These rulings and the court cases he has cited are prior to the enactment of section 469 and all refer to section 1402.  Please note in (b)(2) that meeting the material participation requirement of Section 1402 is specifically

excluded from being taken into account for having met the material participation requirement of section 469 in using the facts and circumstances test of (a)(7).

Whether a person meets the material participation requirement of section 469 is a factual determination. The Reg. 1.469-5T(f)(2)(ii) defines investors' activities that are not considered in meeting the hourly requirement. Simply signing a statement or making an election are not a means in meeting the requirement. Although Section 469 may not have existed at the time of your initial investment, it is law that investors have to address in claiming investment losses today. Contrary to Mr. Hoyt's statement, time spent reading and thinking about this issue should not be considered as material participation hours for 1992.

If this letter is somewhat confusing or you are questioning the accuracy of this letter, I recommend you consider having an independent accountant or attorney review this matter with you.

Petitioner also received several notices informing him that respondent was beginning an examination of the various partnerships in which petitioner was involved, including DSBS 87-C. Petitioner received such notices dated August 21, 1989, May 21, 1990, August 13, 1990, February 19, 1991 (two notices), February 3, 1992, and February 18, 1992. Finally, respondent had frozen the refunds petitioner claimed on his 1987 and 1988 Federal income tax returns that were derived from the Hoyt partnership losses. In late 1988 and mid-1989, petitioner twice inquired into the status of the 1987 refund; respondent subsequently notified petitioner by letter that his 1984 through 1988 accounts were being audited.

When petitioner received any correspondence from respondent, petitioner would send copies to the Hoyt organization; petitioner would take no further action or seek advice concerning the

information that he was receiving from respondent.  Petitioner
interpreted the letters that he was receiving from respondent to
mean that respondent was "claiming that we're not running a
legitimate business and that they are going to disallow any
deductions or credits that we had claimed."

On April 22, 1992, after the year in issue but before filing
his return for that year, petitioner signed a series of documents
evidencing petitioner's intention to invest in the partnership
SGE 84-2.

Petitioner filed an individual Federal income tax return for
his taxable year 1991, the year in issue.  He reported the
following on this return:

| | |
|---|---:|
| Wage income | $48,405 |
| Interest income | 4,512 |
| SGE 84-2 loss | (39,160) |
| DSBS 87-C loss | (16,720) |
| Capital gain | 13,003 |
| Farm income | 4,824 |
| IRA contribution deduction | (2,000) |
| Adjusted gross income | 12,864 |
| Tax liability | 724 |

The losses from SGE 84-2 and DSBS 87-C were reported on Schedules
K-1, Partner's Share of Income, Credits, Deductions, Etc., issued
to petitioner by the partnerships for the partnerships' taxable
years ending in 1991.  Both the capital gain and the IRA
contribution deduction reported on petitioner's return are
derived from SGE 84-2.  Although it appears from the return that
the farm income is related to petitioner's Hoyt investment, it is

unclear how this amount of income was calculated or earned. Attached to the return was a "Material Participation Statement", on which petitioner averred that he spent 121 hours during 1991 working in various Hoyt-related activities. The 1991 return was signed by Mr. Hoyt as the return preparer on June 18, 1992, and it was signed by petitioner on July 26, 1992.

Starting with the 1986 return and the Form 1045, and continuing through the 1991 return, Mr. Hoyt or a member of the Hoyt organization prepared petitioner's tax forms. Upon signing the returns, petitioner did not know how the Hoyt-related items were derived; he knew only that Mr. Hoyt or a member of his organization had entered the items on the Schedules K-1 and on the returns, and he assumed the items were therefore correct. Petitioner did not have the returns reviewed by an accountant or anyone else outside the Hoyt organization prior to signing them.

The section 6662(a) accuracy-related penalty in this case is derived solely from the loss that petitioner claimed in 1991 with respect to DSBS 87-C. Respondent issued a Notice of Final Partnership Administrative Adjustment (FPAA) to petitioner with respect to DSBS 87-C that reflected the disallowance of various deductions claimed on the partnership return for its taxable year ending in 1991. Because a timely petition to this Court was not filed in response to the FPAA issued for DSBS 87-C, respondent made a computational adjustment assessment against petitioner

with respect to the FPAA.  The computational adjustment changed petitioner's claimed DSBS 87-C loss of $16,720 to income of $4,421, increasing petitioner's tax liability by $3,918, from $724 to $4,642.  In the notice of deficiency underlying this case, respondent determined that petitioner is liable for the section 6662(a) accuracy-related penalty for negligence or disregard of rules or regulations with respect to the entire amount of the underpayment resulting from the DSBS 87-C computational adjustment.

OPINION

I.  Evidentiary Issues

As a preliminary matter, we address evidentiary issues raised by the parties in the stipulations of facts.  The parties reserved objections to a number of the exhibits and paragraphs contained in the stipulations, all on the grounds of relevancy. We address here those objections that were not withdrawn by the parties at trial.  Federal Rule of Evidence 402[1] provides the general rule that all relevant evidence is admissible, while evidence which is not relevant is not admissible.  Federal Rule of Evidence 401 provides that "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or

_____

[1]The Federal Rules of Evidence are applicable in this Court pursuant to sec. 7453 and Rule 143(a).

less probable than it would be without the evidence." While certain of the exhibits and stipulated facts are given little to no weight in our finding of ultimate facts in this case, we hold that the exhibits and stipulated facts meet the threshold definition of "relevant evidence" under Federal Rule of Evidence 401, and that the exhibits and stipulated facts therefore are admissible under Federal Rule of Evidence 402. Accordingly, to the extent that the Court did not overrule the relevancy objections at trial, we do so here.

## II. The Section 6662(a) Accuracy-Related Penalty

Section 6662(a) imposes an addition to tax of 20 percent on the portion of an underpayment attributable to any one of various factors, one of which is "negligence or disregard of rules or regulations". Sec. 6662(a) and (b)(1). "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and "disregard of rules or regulations" includes any careless, reckless, or intentional disregard. Sec. 6662(c). The regulations under section 6662 provide that negligence is strongly indicated where: A taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be "too good to be true" under the circumstances * * * . Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

Negligence is defined as the "'lack of due care or failure to do what a reasonable or ordinarily prudent person would do under the circumstances.'" Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part on another ground 43 T.C. 168 (1964)); see Pasternak v. Commissioner, 990 F.2d 893, 902 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181.  Negligence is determined by testing a taxpayer's conduct against that of a reasonable, prudent person. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).  Courts generally look both to the underlying investment and to the taxpayer's position taken on the return in evaluating whether a taxpayer was negligent.  Sacks v. Commissioner, 82 F.3d 918, 920 (9th Cir. 1996), affg. T.C. Memo. 1994-217.  When an investment has such obviously suspect tax claims as to put a reasonable taxpayer under a duty of inquiry, a good faith investigation of the underlying viability, financial structure, and economics of the investment is required.  Roberson v. Commissioner, T.C. Memo. 1996-335, affd. without published opinion 142 F.3d 435 (6th Cir. 1998) (citing LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991), affd. without published opinion 956 F.2d 274 (9th Cir. 1992); Horn v. Commissioner, 90 T.C. 908, 942 (1988)).

The Commissioner's decision to impose the negligence penalty is presumptively correct.[2]  Rule 142(a); <u>Pasternak v. Commissioner</u>, <u>supra</u> at 902.  Thus, a taxpayer has the burden of proving that respondent's determination is erroneous and that he did what a reasonably prudent person would have done under the circumstances.  <u>Bixby v. Commissioner</u>, 58 T.C. 757, 791 (1972).

III.  <u>Application of the Negligence Standard</u>

Although petitioner had no background in farming or ranching, and petitioner did not consult any independent investment advisers, petitioner made the decision to invest in a cattle ranching activity as a means to provide for retirement. As part of his initial investment in the Hoyt partnerships, petitioner provided Mr. Hoyt with the authority to sign promissory notes on his behalf in an amount of at least $75,000. Petitioner also gave Mr. Hoyt the authority to control a number of aspects of his investment, without requiring any confirmation or consultation with petitioner.  Nevertheless, petitioner placed his trust entirely with the promoters of the investment and, as discussed in detail below, he did not adequately investigate either the legitimacy of the partnerships or the implications of

---

[2]While sec. 7491 shifts the burden of production and/or burden of proof to the Commissioner in certain circumstances, this section is not applicable in this case because respondent's examination of petitioner's return did not commence after July 22, 1998.  See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

the promissory notes. This trust continued even when the Hoyt organization switched petitioner's investment from partnership to partnership, at times without notifying petitioner or verifying the status of the promissory notes that had been signed on petitioner's behalf. We conclude that petitioner was negligent in signing the power of attorney forms and in entering into the investment.

In the years 1986 through 1991, petitioner used the Hoyt investment to report a total Federal income tax liability of $4,349 on income totaling $290,149. In addition, petitioner filed the Form 1045 which purportedly completely eliminated his Federal income tax liabilities for 1983 through 1985, resulting in a requested refund of $18,548. Petitioner claimed these tax benefits based solely on the advice that he received from the promoters of the investment and from other Hoyt investors-- petitioner never questioned the amounts on the tax returns, and he never had the returns reviewed by a tax professional. Furthermore, the promotional materials that petitioner received had clearly indicated that there were substantial tax risks in making an investment. Nevertheless, petitioner did not inquire into the tax claims being made on his tax returns by the Hoyt organization with anyone outside the organization. This failure to inquire is especially notable with respect to petitioner's 1986 return and amended return. In preparing petitioner's

amended return for that year, the Hoyt organization prepared a statement in which it was claimed that petitioner's partnership interest had been switched from DGE 86-1 to SGE 84-2. At that time, however, petitioner had signed partnership agreements and other documents pertaining only to SGE 86; the investment documents in the record show that petitioner did not invest in SGE 84-2 until April 1992. Furthermore, the Hoyt organization reported to petitioner that the claimed investment tax credit of $17,412 that was no longer available was being replaced by a loss of $141,260. Petitioner accepted at face value that these amounts were accurate, even when the amounts were of such size that they purportedly completely eliminated petitioner's tax liability for 3 prior years.

When it came time to prepare petitioner's tax returns and claim the losses being reported by the Hoyt partnerships, petitioner relied on the very people who were receiving the bulk of the tax savings generated by the claims. Thus, the same individuals who sold petitioner an interest in the Hoyt partnerships and who managed the purported ranching operations also prepared the partnerships' tax returns, prepared petitioner's tax returns, and received from petitioner most of the tax savings that resulted from the positions taken on his returns.

With respect to 1991, the year in issue in this case, petitioner claimed that he incurred $55,880 in losses from the Hoyt partnerships.  Petitioner did not know how these losses were derived; he knew only that the Hoyt organization had reported the amounts on the Schedules K-1 and on his tax return.  Petitioner claimed these losses despite the fact that respondent had been warning petitioner, at least since May 1988, that there were potential problems with the tax claims being made on both the partnership returns and on petitioner's returns.  Prior to signing his 1991 return, petitioner had received at least 12 separate letters from respondent alerting petitioner to suspected problems or alerting petitioner to reviews that had been commenced with respect to various Hoyt partnerships in which he was involved.  Despite these letters, petitioner did not further investigate the partnership losses, such as by consulting an independent tax adviser, before claiming the losses as deductions on his 1991 return.  We conclude that petitioner was negligent in 1991 in claiming the Hoyt partnership loss at issue in this case; namely, the $16,720 loss from DSBS 87-C.

IV.  Alleged Defenses to the Accuracy-Related Penalty

Section 6664(c)(1) provides that the section 6662(a) accuracy-related penalty is not imposed "with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in

good faith with respect to such portion." "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-4(b)(1), Income Tax Regs. The extent of the taxpayer's effort to ascertain his proper tax liability is generally the most important factor. Id.

A.  Petitioner's Investigation and Reliance on Others

Good faith reliance on professional advice concerning tax laws may be a defense to the negligence penalties. United States v. Boyle, 469 U.S. 241, 250-251 (1985); see also sec. 1.6664-4(b)(1), Income Tax Regs. However, "Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). In order to be considered as such, the reliance must be reasonable. Id. To be objectively reasonable, the advice generally must be from competent and independent parties unburdened with an inherent conflict of interest, not from the promoters of the investment. Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir. 1994), affg. T.C. Memo. 1993-480; LaVerne v. Commissioner, 94 T.C. at 652; Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Edwards v. Commissioner, T.C. Memo. 2002-169. Furthermore, the taxpayer must show that any expert rendering an opinion with respect to an investment had

the expertise and knowledge of the pertinent facts necessary to render such an opinion.  Barlow v. Commissioner, 301 F.3d 714, 724 (6th Cir. 2002), affg. T.C. Memo. 2000-339; Freytag v. Commissioner, supra at 888.

### 1.  Reliance on the Hoyt Organization and Partners

Petitioner argues that he should escape the negligence penalty because he relied in good faith on various individuals with respect to the Hoyt investment:  Mr. Hoyt and other members of the Hoyt organization, tax professionals hired by the Hoyt organization, and other Hoyt investor-partners.

It is clear in this case that the advice petitioner received from the Hoyt organization, if any, concerning the partnership loss deduction that resulted in the underpayment underlying the penalty was not objectively reasonable.  First, we note that petitioner has not established that he received any advice at all concerning the deduction.  Although petitioner relied on Mr. Hoyt and his organization to prepare the return, petitioner does not even suggest that he directly questioned Mr. Hoyt or his organization about the nature of the tax claims.  Instead, when petitioner signed the return, he did not question or seek advice from anyone concerning the large partnership loss at issue--he merely assumed the items on the return were proper. Nevertheless, assuming arguendo that petitioner did receive advice from Mr. Hoyt or someone within his organization, any such

advice that he received is in no manner objectively reasonable. Mr. Hoyt and his organization created and promoted the partnership, they completed petitioner's tax return, and they received the bulk of the tax benefits from doing so. For petitioner to trust Mr. Hoyt or members of his organization for tax advice and/or to prepare his return under these circumstances was inherently unreasonable.

In addition to members of the Hoyt organization itself, petitioner argues that he relied on tax professionals hired by the Hoyt organization and on other Hoyt investors. Petitioner, however, has only established that he believed that the Hoyt organization and the other partners had consulted with tax professionals. Petitioner has not established in what manner he personally relied upon any such professionals, or even the details of what advice the professionals provided that would be applicable to petitioner's situation with respect to the year in issue. Furthermore, because all of these individuals were affiliated with the Hoyt organization, it would have been objectively unreasonable for petitioner to rely upon them in claiming the tax benefits advertised by that very organization.

### 2. Petitioner's Early Investigation

Petitioner next argues that he had reasonable cause for the underpayment because he made a reasonable investigation into the partnership. Petitioner asserts that this investigation yielded

no indication of wrongdoing by Mr. Hoyt, and that an "average taxpayer" was unable to discover this wrongdoing. As we have held, any reliance by petitioner on materials provided by the Hoyt organization and its partners was not objectively reasonable. Petitioner, however, argues that his investigation went further than the Hoyt promotional materials and other Hoyt partners.

Petitioner's testimony at trial concerning his investigation into the partnership can be summarized as follows. After acquiring the informational packet from the Hoyt organization, petitioner mailed the packet to his father so that his father could show it to a tax professional. Petitioner's father subsequently told petitioner that "The attorney looked over it and he said there was nothing illegal." In addition, one of the group of petitioner's coworkers who was also interested in investing decided to contact the IRS for information. This coworker told petitioner that "there was no indication from the IRS that there was anything wrong with Hoyt or anything like that." Finally, a second coworker traveled to California "to go to their [Hoyt's] offices and also * * * to at least one ranch to be sure that it was a viable business and that there was actually people running a business and there was actually cows involved."

Assuming arguendo the veracity of petitioner's version of events, we do not find that petitioner reasonably relied upon any

advice from a tax professional concerning the Hoyt investment. Petitioner's testimony concerning his reliance on his father's tax professional--to whom petitioner did not pay any fee for advice--was vague and lacked any degree of detail. In particular, it remains unclear exactly what information was contained in the packet that petitioner asserts he sent to his father. Petitioner also did not provide the name of the professional, and while he initially testified that the professional was a tax lawyer, he later referred to him a his father's "tax accountant". Petitioner provided no contemporaneous written statement from the professional, and he testified that because of his father's death he was unable to discover the professional's name prior to trial. Petitioner's description of the advice from the professional was also vague, consisting merely of a broad and conclusory statement that nothing about the investment was illegal. Petitioner admits that he did not personally speak with the professional, that he did not provide him with any details concerning his particular investment with the Hoyt organization, and that he was unsure how much of the informational packet the professional reviewed. Furthermore, although the professional purportedly told petitioner's father that there were risks involved with the investment, petitioner did not question the professional concerning the nature of the risks or otherwise investigate them.

In conclusion, we find that petitioner did not reasonably rely on any advice that he received from the professional through his father because any such advice was not provided by someone who had all the necessary information to make an informed decision, and because the advice was conclusory and did not address any of the specific risks involved in an investment, including the tax risks. See Barlow v. Commissioner, supra; Hunt v. Commissioner, T.C. Memo. 2001-15.

We similarly find that any reliance upon petitioner's coworkers to investigate the partnership was not reasonable. With respect to the coworker who purportedly contacted the IRS, the record is completely devoid of any detail concerning what information he provided to the IRS or what information he received in return. With respect to the coworker who purportedly traveled to visit a Hoyt ranch, there has been no suggestion that this coworker had any background in cattle ranching or was otherwise qualified to investigate the Hoyt organization. See Freytag v. Commissioner, supra at 888.

We note that, even if petitioner did rely upon the individuals discussed above, any such reliance would have been 5 years before he signed the return that resulted in the penalty at issue in this case. Petitioner's continued reliance on any information gained from these individuals over such a long period of time--in light of the large losses being claimed by the

partnerships, the discrepancies in the partnerships in which petitioner was involved, and the continuous warnings being sent by respondent--was unreasonable under the circumstances.

In summary, petitioner asserts that his investigation yielded no indication of wrongdoing by Mr. Hoyt, and that an "average" taxpayer would have been unable to uncover Mr. Hoyt's fraud. However, we conclude that petitioner was nevertheless negligent in not adequately investigating the partnership and/or seeking qualified independent advice concerning it.

B.  Deception and Fraud by Mr. Hoyt

Petitioner next argues that he should not be liable for the negligence penalty because he was defrauded and otherwise deceived by Mr. Hoyt with respect to his investment in the Hoyt partnerships. In this regard, petitioner first argues that the doctrine of judicial estoppel bars application of the negligence penalty because the U.S. Government successfully prosecuted Mr. Hoyt for, in general terms, defrauding petitioner.

Judicial estoppel is a doctrine that prevents parties in subsequent judicial proceedings from asserting positions contradictory to those they previously have affirmatively persuaded a court to accept. United States ex rel. Am. Bank v. C.I.T. Constr., Inc., 944 F.2d 253, 258-259 (5th Cir. 1991); Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598-599 (6th Cir. 1982). Both this Court and the Court of Appeals for the Sixth

Circuit, to which appeal in this case lies, have accepted the doctrine of judicial estoppel.  See Edwards v. Aetna Life Ins. Co., supra; Huddleston v. Commissioner, 100 T.C. 17, 28-29 (1993).

The doctrine of judicial estoppel focuses on the relationship between a party and the courts, and it seeks to protect the integrity of the judicial process by preventing a party from successfully asserting one position before a court and thereafter asserting a completely contradictory position before the same or another court merely because it is now in that party's interest to do so.  Edwards v. Aetna Life Ins. Co., supra at 599; Huddleston v. Commissioner, supra at 26.  Whether or not to apply the doctrine is within the sound discretion of the court, but it should be applied with caution in order "'to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement.'"  Daugharty v. Commissioner, T.C. Memo. 1997-349 (quoting Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1218 (6th Cir. 1990)), affd. without published opinion 158 F.3d 588 (11th Cir. 1998).

Judicial estoppel generally requires acceptance by a court of the prior position and does not require privity or detrimental reliance of the party seeking to invoke the doctrine.  Huddleston v. Commissioner, supra at 26.  Acceptance by a court does not

require that the party being estopped prevailed in the prior proceeding with regard to the ultimate matter in dispute, but rather only that a particular position or argument asserted by the party in the prior proceeding was accepted by the court.  Id.

Respondent's position in this case is in no manner contradictory to the position taken by the United States in the criminal conviction of Mr. Hoyt.  See, e.g., Goldman v. Commissioner, 39 F.3d at 408 (taxpayer-appellants' argument that an investment partnership "constituted a fraud on the IRS, as found by a civil jury * * * and by the tax court * * * cannot justify appellants' own failure to exercise reasonable care in claiming the losses derived from their investment").  To the contrary, this Court has sustained a finding of negligence with respect to investors who had been victims of deception by tax shelter promoters.  For example, in Klieger v. Commissioner, T.C. Memo. 1992-734, this Court held that taxpayers in a situation similar to that of petitioner were negligent.  In Klieger, we addressed taxpayers' involvement in certain investments that were sham transactions that lacked economic substance:

> Petitioners are taxpayers of modest means who were euchred by Graham, a typical shifty promoter.  Graham sold petitioners worthless investments by giving spurious tax advice that induced them to reduce their withholding and turn their excess pay over to Graham as initial payments to acquire interests in "investment programs" that did not produce any economic return and apparently never had any prospects of doing so.  Graham purported to fulfill his prophecies about the tax treatment of the Programs by preparing petitioners' tax returns and claiming deductions

and credits that have been disallowed in full, with
resulting deficiencies* * *. * * *

* * * * * * *

When a tax shelter is a sham devoid of economic
substance and a taxpayer relies solely on the tax shelter
promoter to prepare his income tax return or advise him how
to prepare the return with respect to the items attributable
to the shelter that the promoter has sold him, it will be
difficult for the taxpayer to carry his burden of proving
that he acted reasonably or prudently.  Although a tax
shelter participant, as a taxpayer, has a duty to use
reasonable care in reporting his tax liability, the promoter
who prepares the participant's tax return can be expected to
report large tax deductions and credits to show a relatively
low amount of tax due, and thereby fulfill the prophecies
incorporated in his sales pitch. * * *

We conclude that there are no grounds for application of judicial

estoppel in the present case.

In a vein similar to his judicial estoppel argument,

petitioner further argues that Mr. Hoyt's deception resulted in

an "honest mistake of fact" by petitioner when he entered into

his investment.  More specifically, petitioner asserts that he

had insufficient information concerning the losses, and that "all

tangible evidence available to the Hoyt partners supported Jay

Hoyt's statements."

Reasonable cause and good faith under section 6664(c)(1) may

be indicated where there is "an honest misunderstanding of fact

or law that is reasonable in light of all the facts and

circumstances, including the experience, knowledge and education

of the taxpayer."  Sec. 1.6664-4(b)(1), Income Tax Regs.

However, "reasonable cause and good faith is not necessarily

indicated by reliance on facts that, unknown to the taxpayer, are incorrect."  Id.

For the reasons discussed above in applying the negligence standard, whether or not petitioner had an "honest mistake of fact" does not alter our conclusion that petitioner's actions in relation to his investment and the tax claims were objectively unreasonable.  Furthermore, and again for the reasons discussed above, petitioner's failure to conduct an objectively reasonable investigation--beyond what was made available to him by Mr. Hoyt and his organization--was also negligent.

C.  The Bales Opinion

Petitioner next argues that he had reasonable cause for the underpayment because of this Court's opinion in Bales v. Commissioner, T.C. Memo. 1989-568.[3]  Bales involved deficiencies asserted against various investors in several different cattle partnerships marketed by Mr. Hoyt.  This Court found in favor of the investors on several issues, stating that "the transaction in

---

[3]Petitioner also argues that the opinion in Bales v. Commissioner, T.C. Memo. 1989-568, provided "substantial authority for the positions taken on petitioner's 1991 income tax return."  There is no explicit "substantial authority" exception to the sec. 6662(a) accuracy-related penalty for negligence. Hillman v. Commissioner, T.C. Memo. 1999-255 n.14 (citing Wheeler v. Commissioner, T.C. Memo. 1999-56).  While petitioner refers to the "reasonable basis" exception to the negligence penalty, set forth in sec. 1.6662-3(b)(3), Income Tax Regs., he does not specifically argue that the exception applies in this case. Nevertheless, we note that the record does not establish that petitioner had a reasonable basis for claiming the partnership loss at issue in this case.

issue should be respected for Federal income tax purposes."
Bales involved different investors, different partnerships,
different taxable years, and different issues than those
underlying the present case.

First, petitioner argues that he relied on the Bales opinion
in claiming the deduction for the partnership loss. Without
further addressing the applicability of Bales to petitioner's
situation, we find that petitioner has not established that he
relied on Bales in this manner. While petitioner received the
opinion and may have read a portion of it, there is no evidence
that he, without any background in law or accounting, personally
relied upon the opinion in claiming the relevant partnership
loss. Rather, petitioner admits that he relied instead on the
interpretation of Bales provided by Mr. Hoyt and members of his
organization, who repeatedly claimed that Bales was proof that
the partnerships and the tax positions were legitimate. We have
already found that petitioner's reliance on Mr. Hoyt and his
organization was objectively unreasonable and, as such, not a
defense to the negligence penalty. Accepting Mr. Hoyt's
assurances that Bales was a wholesale affirmation of his
partnerships and his tax claims was no less unreasonable.

Second, petitioner argues that, because this Court was
unable to uncover the fraud or deception by Mr. Hoyt in Bales,
petitioner as an individual taxpayer was in no position to

evaluate the legitimacy of his partnership or the tax benefits claimed with respect thereto.  This argument employs Bales as a red herring:  Bales involved different investors, different partnerships, different taxable years, and different facts.  The taxpayers in Bales were individual investors whose taxable years involved were 1974 through 1979.  Although the Court held that the cattle breeding partnerships were bona fide and should not be disregarded as shams, the taxpayers did not receive all of the tax benefits they claimed.  However, in Durham Farms #1 v. Commissioner, T.C. Memo. 2000-159, affd. 59 Fed. Appx. 952 (9th Cir. 2003), we found that by the early 1980s the Hoyt organization's cattle management and record keeping practices changed dramatically, and most of the records, documents, and tax returns pertaining to the cattle breeding partnerships were inaccurate and unreliable.  In fact, many of the cattle purportedly purchased by the partnerships never existed.  Therefore, all claimed tax benefits were disallowed in full.  Thus, it would not have been reasonable for petitioner to rely upon Bales in making investments herein and claiming the tax benefits that Mr. Hoyt promised would ensue.

D. <u>Fairness Considerations</u>

Petitioner's final arguments concerning application of the accuracy-related penalty are in essence arguments that imposition of the penalty would be unfair or unjust in this case. Petitioner argues that "The application of penalties in the present case does not comport with the underlying purpose of penalties." To this effect, petitioner argues that, in this case:

> the problem was not Petitioner's disregard of the tax laws, but was Jay Hoyt's fraud and deception. Petitioner did not engage in noncompliant behavior, instead he was the victim of a complex fraud that it took Respondent years to completely unravel.

> Petitioner made a good faith effort to comply with the tax laws and punishing him by imposing penalties does not encourage voluntary compliance, but instead has the opposite effect of the appearance of unfairness by punishing the victim. Indeed, penalties are improper for any investor in the Hoyt partnerships on a policy basis alone. [Fn. ref. omitted.]

We are mindful of the fact that petitioner was a victim of Mr. Hoyt's fraudulent actions. Petitioner ultimately lost the bulk of the tax savings that he received, which he had remitted to Mr. Hoyt as part of his investment and which he never received back. Nevertheless, petitioner believed that this money was being used for his own personal benefit--at the time that he claimed the tax savings, he believed that he would eventually benefit from them. Petitioner also lost a substantial amount of out-of-pocket cash which he paid to Mr. Hoyt in the years preceding and following

the year in issue.  However, this does not alter our conclusion that petitioner was negligent with respect to entering the Hoyt investment, and that he was negligent with respect to the positions that he took on his 1991 tax return.  Despite Mr. Hoyt's actions, the positions taken on the 1991 return signed by petitioner were ultimately the positions of petitioner, not of Mr. Hoyt.

V.  Conclusion

On the basis of the record before the Court, we conclude that petitioner's actions in relation to the Hoyt investment constituted a lack of due care and a failure to do what a reasonable or ordinarily prudent person would do under the circumstances.  First, petitioner entered into an investment--in which he gave Mr. Hoyt the authority to incur personal debts on his behalf and control his interest in his partnerships--without adequately investigating the legitimacy of the partnerships.  Second, and foremost, petitioner trusted individuals who told him that he effectively could escape paying Federal income taxes for a number of years--petitioner reported a combined tax liability of $4,349 on $290,149 of income over 6 years starting with 1986, and reported zero tax liability on $116,170 of AGI for the prior 3 years--based solely upon the tax advice of the individuals receiving some of the benefits of the tax savings.  Our conclusion is reinforced by the fact that petitioner received

multiple warnings from respondent, warnings that petitioner chose to ignore.  We find that petitioner was negligent with respect to entering the Hoyt investment, and that he was negligent with respect to claiming the DSBS 87-C loss on his return.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.